IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| LEON SANDERS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No.: 2:12-CV-2093-VEH |
| | ) |
| CAROLYN COLVIN, | ) |
| ACTING COMMISSIONER, | ) |
| SOCIAL SECURITY | ) |
| ADMINISTRATION | ) |
| | ) |
| Defendant. | ) |

## **MEMORANDUM OPINION**[1]

Plaintiff Leon Sanders ("Mr. Sanders") brings this action under 42 U.S.C. § 405(g), Section 205(g) of the Social Security Act. He seeks review of a final adverse decision of the Commissioner of the Social Security Administration ("Commissioner"), who denied his application for Supplemental Security Income

---

[1] Carolyn W. Colvin was named the Acting Commissioner on February 14, 2013. *See* http://www.socialsecurity.gov/pressoffice/factsheets/colvin.htm ("On February 14, 2013, Carolyn W. Colvin became the Acting Commissioner of Social Security.") (last accessed on September 16, 2013). Under 42 U.S.C. § 405(g), "[a]ny action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office." Accordingly, pursuant to 42 U.S.C. § 405(g) and Rule 25(d) of the Federal Rules of Civil Procedure, the court has substituted Carolyn W. Colvin for Michael Astrue in the case caption above and **HEREBY DIRECTS** the clerk to do the same party substitution on CM/ECF.

("SSI").[2] Mr. Sanders timely pursued and exhausted his administrative remedies available before the Commissioner. The case is thus ripe for review under 42 U.S.C. § 405(g).[3]

## FACTUAL AND PROCEDURAL HISTORY

Mr. Sanders was 54 years old at the time of his hearing before the Administrative Law Judge ("ALJ"). *See* Tr. 41. He has completed the twelfth grade and possesses an associate's degree in accounting. Tr. 61, 303. His past work experience includes employment as a check processing clerk. Tr. 29, 58. As explained further below, he presently claims he became disabled on April 16, 2008. *See* Doc. 8 at 4; Tr. 185. His last period of work ended on September 1, 2003. Tr. 190.

On April 16, 2008, Mr. Sanders protectively filed a Title II application for a period of disability and DIB. Tr. 19. He also protectively filed a Title XVI application for SSI on that date. *Id.* In both applications, Mr. Sanders claimed that his disability began on September 1, 2003. *Id.* On October 15, 2008, the Commissioner initially denied these claims. *Id.* Mr. Sanders timely filed a written request for a hearing on

---

[2]In general, the legal standards applied are the same regardless of whether a claimant seeks DIB or SSI. However, separate, parallel statutes and regulations exist for DIB and SSI claims. Therefore, citations in this opinion should be considered to refer to the appropriate parallel provision as context dictates. The same applies to citations of statutes or regulations found in quoted court decisions.

[3]42 U.S.C. § 1383(c)(3) renders the judicial review provisions of 42 U.S.C. § 405(g) fully applicable to claims for SSI.

November 17, 2008. *Id.* The ALJ conducted a hearing on the matter on May 6, 2010. *Id.*

At some point before the hearing, Mr. Sanders amended his alleged disability onset date to April 16, 2008. *Id.* As he was last insured under the Social Security Act on June 30, 2007, Tr. 186, he was therefore not entitled to a period of disability or DIB under the Act. *See* 20 C.F.R. §§ 404.130, 404.131, 404.315. At the hearing, he voluntarily withdrew his request for hearing as it concerned his applications for period of disability and DIB. Tr. 19.  The ALJ therefore addressed only his SSI application. *Id.* On May 24, 2010, he issued his opinion concluding Mr. Sanders was not disabled and denying him SSI benefits. Tr. 31.  Mr. Sanders timely petitioned the Appeals Council to review the decision on June 23, 2010. Tr. 15. On April 6, 2012, the Appeals Council issued a denial of review on his claim. Tr. 1.

Mr. Sanders filed a Complaint with this court on June 6, 2012, seeking review of the Commissioner's determination. Doc. 1. The Commissioner answered on October 1, 2012. Doc. 6. Mr. Sanders filed a supporting brief (Doc. 8) on November 15, 2012, and the Commissioner responded with her own (Doc. 9) on December 17, 2013. With the parties having fully briefed the matter, the court has carefully considered the record and reverses the decision of the Commissioner.

## STANDARD OF REVIEW

The court's review of the Commissioner's decision is narrowly circumscribed. The function of this court is to determine whether the decision of the Commissioner is supported by substantial evidence and whether proper legal standards were applied. *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002). This court must "scrutinize the record as a whole to determine if the decision reached is reasonable and supported by substantial evidence." *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983). Substantial evidence is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Id.* It is "more than a scintilla, but less than a preponderance." *Id.*

This court must uphold factual findings that are supported by substantial evidence. However, it reviews the ALJ's legal conclusions de novo because no presumption of validity attaches to the ALJ's determination of the proper legal standards to be applied. *Davis v. Shalala*, 985 F.2d 528, 531 (11th Cir. 1993). If the court finds an error in the ALJ's application of the law, or if the ALJ fails to provide the court with sufficient reasoning for determining that the proper legal analysis has been conducted, it must reverse the ALJ's decision. *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991).

## **STATUTORY AND REGULATORY FRAMEWORK**

To qualify for disability benefits and establish his or her entitlement for a

period of disability, a claimant must be disabled as defined by the Social Security Act and the Regulations promulgated thereunder.[4] The Regulations define "disabled" as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve (12) months." 20 C.F.R. § 404.1505(a). To establish an entitlement to disability benefits, a claimant must provide evidence about a "physical or mental impairment" which "must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 404.1508.

The Regulations provide a five-step process for determining whether a claimant is disabled. 20 C.F.R. § 404.1520(a)(4)(i-v). The Commissioner must determine in sequence:

(1)  whether the claimant is currently employed;

(2)  whether the claimant has a severe impairment;

(3)  whether the claimant's impairment meets or equals an impairment listed by the [Commissioner];

(4)  whether the claimant can perform his or her past work; and

---

[4]The "Regulations" promulgated under the Social Security Act are listed in 20 C.F.R. Parts 400 to 499, revised as of April 1, 2007.

> (5) whether the claimant is capable of performing any work in the national economy.

*Pope v. Shalala*, 998 F.2d 473, 477 (7th Cir. 1993) (citing to formerly applicable C.F.R. section), *overruled on other grounds by Johnson v. Apfel*, 189 F.3d 561, 562-63 (7th Cir. 1999); *accord McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986). The sequential analysis goes as follows:

> Once the claimant has satisfied steps One and Two, she will automatically be found disabled if she suffers from a listed impairment. If the claimant does not have a listed impairment but cannot perform her work, the burden shifts to the [Commissioner] to show that the claimant can perform some other job.

*Pope*, 998 F.2d at 477; *accord Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995). The Commissioner must further show that such work exists in the national economy in significant numbers. *Id.*

## **FINDINGS OF THE ADMINISTRATIVE LAW JUDGE**

After consideration of the entire record, the ALJ made the following findings:

1. Mr. Sanders met the insured status requirements of the Social Security Act through June 30, 2007.

2. He had not engaged in substantial gainful activity since April 16, 2008, the alleged disability onset date.

3. He had the following severe impairments: pain disorder; depressive disorder, not otherwise specified with psychotic features; anxiety disorder, not otherwise specified; history of cannabis and cocaine abuse; hypertension; genital herpes; viral hepatitis C, chronic; minimal degenerative disease in right sacroiliac joint; right median

       mononeuropathy at wrist; right C-7 chronic radiculopathy; obesity, coronary artery disease; and mild osteoarthritis of the right knee.

4. He did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5. He had the residual functioning capacity ("RFC") to occasionally lift 20 pounds; frequently lift 10 pounds; sit for two hours at one time for a total of eight hours during an eight hour day; stand for two hours at a time for a total of six hours during an eight hour day; walk for two hours at one time for a total of six hours during an eight hour day; constantly handle and finger bilaterally; had no more than moderate limitations in mental basic work activities, understanding, remembering and carrying out simply instructions, use of judgment, responding appropriately to supervision, co-workers and usual work situations, dealing with changes in a routine work setting and responding to customary work pressures; and would miss no more than one-and-a-half days of work per month.

6. He was able to perform his past relevant work as a check processing clerk, which is classified as light and unskilled. This work did not require the performance of work-related activities precluded by his RFC.

Tr. 21-29. Although the ALJ found that Mr. Sanders could perform his past relevant work, he also concluded that there were other jobs existing in the national economy that Mr. Sanders could perform. Tr. 30. He therefore made the following "alternative" findings:

7. Mr. Sanders was born on October 1, 1955, and was 52 years old on the alleged disability onset date, which is defined as an individual closely approaching advanced age.

8. He had at least a high school education and was able to communicate in English.

9. Transferability of job skills was not an issue in this case because the claimant's past relevant work was unskilled.

10. Considering Mr. Sanders's age, education, work experience, and residual functioning capacity, there were jobs that existed in significant numbers in the national economy that he could perform.

Tr. 30. The ALJ then concluded that Mr. Sanders had not been under a disability, as defined in the Social Security Act, from April 16, 2008, through the date of this decision. Tr. 31.

## ANALYSIS

**I.   Introduction**

The court may only reverse a finding of the Commissioner if it is not supported by substantial evidence. 42 U.S.C. § 405(g). "This does not relieve the court of its responsibility to scrutinize the record in its entirety to ascertain whether substantial evidence supports each essential administrative finding." *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) (citing *Strickland v. Harris*, 615 F.2d 1103, 1106 (5th Cir. 1980)).[5] However, the court "abstains from reweighing the evidence or substituting its own judgment for that of the [Commissioner]." *Id.* (citation omitted).

Mr. Sanders urges this court to reverse the Commissioner's decision to deny

---

[5]*Strickland* is binding precedent in this Circuit. *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) (adopting as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981).

his benefits on two grounds: (1) the ALJ improperly evaluated the medical opinion evidence; and (2) the ALJ improperly discredited Mr. Sanders's subjective evaluation. Doc. 8 at 6, 10. The court agrees with Mr. Sanders's first objection and finds that it merits remand.

## II.    The ALJ unjustifiably disregarded Dr. Rogers's dire GAF diagnosis.

Mr. Sanders first argues that the ALJ erred in dismissing the Global Assessment of Functioning ("GAF")[6] score assigned to him by Dr. Jon Rogers, Ph.D., a clinical psychologist who examined him on September 17, 2008. Doc. 8 at 7. Dr. Rogers drafted a "Psychological Evaluation" report from this meeting, which is included in the record. Tr. 302-306. In that document, Dr. Rogers recorded the following relevant observations:

- Mr. Sanders had previously received mental health treatment, beginning in 1991, after a suicide attempt and "depressive behaviors developed after going through a divorce." His most recent treatment had been in 2008.

- His 1991 attempted suicide involved him driving his car over the side of the freeway. It was his only attempted suicide.

- He "reported experiencing the following manic-like symptoms: stays up late and for long periods and talks a lot" – most recently, four days

---

[6]The Global Assessment of Functioning, or GAF Scale, is a numeric scale that mental health physicians and doctors use to rate the occupational, psychological, and social functioning of adults. *The Am. Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. 2000).

9

before the appointment.

- He had a "family history of psychiatric treatment."

- He had "been arrested several times, for domestic violence; most recently in 1999. He spent 20 days in jail."

- At the examination, his "affect was restricted. His mood appeared depressed."

- "Blocking, muteness, repetitions, flight of ideas, etc., were not observed. Loose associations, tangential, or circumstantial thinking, were not observed. Stream of talk and mental activity were accelerated. Speech was pressured."

- He "reported having heard things others could not hear (voices telling him to hurt himself and others . . . most recently yesterday), seen things others could not see . . . and felt that someone was out to get him . . ."

*Id.* The ALJ also noted some relatively positive observations. Mr. Sanders's arrived to the appointment on time, his appearance and hygiene were good, and he dressed appropriately. Tr. 304. His facial expression was alert, and he had no remarkable mannerisms. *Id.* His articulation and conversation were normal. *Id.* His "orientation as to time, place, and person was good." Tr. 305. He correctly performed various concentration and memory tasks. *Id.* Dr. Rogers considered his judgment and insight to be fair. *Id.* Regarding his daily activities, Dr. Rogers concluded that he was "able to function independently," although his activities were "below average." Tr. 306. He then recorded the following "Diagnostic Impression" about Mr. Sanders's

psychological health:

- AXIS I:   Pain Disorder Associated with Psychological Factors and His General Medical Condition.
  Depressive Disorder NOS with Psychotic Features.
  Anxiety Disorder.
  Cocaine Abuse.
  Cannabis Abuse.

- AXIS II:   No diagnosis.

- AXIS III:   Status post rhinoplasty (nerves damaged in face), headaches, dizziness, nightmares, feelings of tension and panic, easy fatigueability, high blood pressure, non-Insulin-dependent diabetes, arthritis, high cholesterol, Hepatitis C, and daily pain (8/10) in his back and "all over."

- AXIS IV:   Psychosocial stress stemming from his difficulties in relationship to his occupational problems.

- AXIS V:   Global Assessment of Functioning = 50.

*Id.* As Mr. Sanders notes in his brief, according to the DSM-IV, a GAF of 50 indicates either (1) "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting)" or (2) "any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *The Am. Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. 2000); *accord Davis v. Astrue*, 287 F. App'x 748, 758 (11th Cir. 2008) (unpublished) (per curiam) ("[A] GAF of 50 indicates either serious symptoms or serious impairments in social, occupational, or school functioning."); *McCloud v. Barnhart*, 166 F. App'x

410, 418 (11th Cir. 2006) (unpublished) (per curiam) ("[T]he ALJ erred when he labeled McCloud's 1998 GAF score [of 45] as reflective of moderate symptoms. In fact, a GAF score of 41–50 indicates severe impairments.").

In his opinion, the ALJ meticulously reviewed Dr. Rogers's observations and diagnosis. He gave "substantial weight" to Dr. Rogers's findings because they were "based upon direct observation and examination of" Mr. Sanders. Tr. 29. However, he entirely discredited Dr. Rogers's GAF diagnosis. According to the ALJ, "Because the GAF score includes factors that do not necessarily indicate mental limitations . . . the GAF of 50 represents additional economic factors and does not document serious limitations in [Mr. Sanders's] mental functioning." Tr. 27. He does not reference Mr. Sanders's GAF score again in the opinion.

This blanket dismissal of Mr. Sanders's grave GAF score is reversible error. The ALJ provided no authority, legal or medical, for his generic assertions regarding what a GAF score represents or what functional inferences may be drawn from it. In fact, his claim that the GAF "does not document serious limitations in [Mr. Sanders's] mental functioning" seems belied by the DSM-IV itself. An ALJ is of course free to discredit a given claimant's GAF score. He or she must, however, tailor their reasoning for doing so <u>to facts specific to that claimant</u> – that is, with references to the claimant's appearance, activities, medical history or other parts of the case record.

*See Davis*, 287 F. App'x at 758; *McLoud*, 166 F. App'x at 418. The law does not permit an ALJ to disregard a GAF score without at least such a minimal, case-specific explanation.[7] This is particularly the case where, as here, the score suggests serious mental illness and is corroborated by the record. *See, e.g.*, Tr. 22 ("The claimant has the following severe impairments: depressive disorder . . . with psychotic features.").

Both *Davis* and *McCloud* reinforce this conclusion. In *Davis*, the claimant's treating psychiatrist had given her a GAF score of 50 on several occasions. 287 F. App'x at 750-51. The ALJ decided to give this opinion "no weight" because the physician's treatment of the claimant was "sporadic" and because he found the score inconsistent with the physician's own treatment notes. *Id.* The Eleventh Circuit decided that that the ALJ's conclusion was unsupported by substantial evidence for a few reasons. First, it determined that the ALJ had misread the physician's treatment notes. *Id.* at 758. Second, as noted above, the court observed that "a GAF of 50 indicates either serious symptoms or serious impairments in social, occupational, or school functioning." *Id.* Because of this fact, it was not all that inconsistent for the

---

[7]The Commissioner notes in her brief that she "has rejected the GAF scale for use in the disability programs . . . the GAF scale 'does not have a direct correlation to the severity requirements in our mental disorders listings.'" Doc. 9 at 10 (quoting 65 Fed. Reg. 50, 746; 50, 764-65 (Aug. 21, 2000)). She also cites a few decisions in this Circuit where courts have declared that GAF scores are not strictly determinative of work ability under the Social Security Act. *Id.* at 9 (citations omitted).The court does not disagree with these decisions. However, it does find persuasive authority in this Circuit requiring ALJ's to properly evaluate GAF scores when they are as dire as Mr. Sanders's was.

claimant's psychiatrist to track her improvements while maintaining her GAF score at 50. *Id.* The court reversed the ALJ's decision for this reason.[8]

*McCloud* is perhaps even more germane to this case. There, the claimant had entered a hospital to undergo treatment for depression, alcohol abuse, and post-traumatic stress disorder. 166 F. App'x at 413. At intake, the staff assigned her a GAF of 30 for "poor insight and suicidal ideation." *Id.* By the time of her discharge a week later, however, her score was 45. *Id.* In reviewing this evidence, the ALJ noted the improvement and concluded that the score of 45 was only "moderate." *Id.* at 415. The Eleventh Circuit reversed on several grounds, one of which was that the ALJ had erred in his characterization of the claimant's GAF score:

> . . . the ALJ erred when he labeled McCloud's 1998 GAF score as reflective of moderate symptoms. In fact, a GAF score of 41–50 indicates severe impairments . . . We are unable to determine from the record what weight the ALJ placed on the GAF score of 45; therefore, we reject the Commissioner's argument that any error was harmless. With the knowledge that a GAF score of 45 reflects severe impairments, the ALJ should determine what, if any, weight to place on the score.

*Id.* at 418.

Both of these decisions were unpublished and therefore do not control the court's determination here. And, of course, neither case's facts precisely conform to

---

[8]The court also reversed the ALJ's decision because it found that he had inappropriately discredited the claimant's subjective complaints of pain. *Id.* at 759-62.

the instant one. In both cases, however, the claimant had a GAF in the 41-50 range. And, in both cases, the Eleventh Circuit concluded that – <u>at the very least</u> – the ALJ had to (1) address the claimant's GAF score; (2) properly characterize the score under the DSM-IV; and (3) assign some weight designation to it (even if it were "no" weight"). The court is persuaded that these are the minimal obligations that an ALJ in this Circuit must satisfy when confronting a claimant's assigned GAF score – at least when the score is as dire as it was here (and was in *Davis* and *McCloud*). The ALJ here certainly addressed Mr. Sanders's GAF score of 50. But, he denied that it reflected "serious limitations" on Mr. Sanders's mental functioning capacity. He also rejected the score for generic reasons that did not reference any facts specific to Mr. Sanders. Given the severity of the score, the ALJ should have at least assigned the score a weight designation that reflected his consideration of the evidence before him. Because he did not, his decision must be reversed and remanded.

## **CONCLUSION**

Based upon the court's evaluation of the evidence in the record and the parties' submissions, the court finds that the Commissioner did not apply proper legal standards in reaching her final decision. Accordingly, the decision will be reversed and remanded by separate order.

**DONE** and **ORDERED** this the 30th day of September, 2013.

_/s/ VEHopkins_
_____
**VIRGINIA EMERSON HOPKINS**
United States District Judge
